CEMENT DIVISION, NATIONAL GYPSUM COMPANY, Reed & Brown, Incorporated, New York Marine Managers, Incorporated, et al., Plaintiffs–Appellants,

v.

CITY OF MILWAUKEE,
Defendant–Appellee.

No. 89–2631.

United States Court of Appeals,
Seventh Circuit.

Argued April 13, 1990.

Decided Oct. 16, 1990.

Rehearing and Rehearing En Banc
Denied Nov. 21, 1990.

Theodore C. Robinson, Ray, Robinson, Hanninen & Carle, Chicago, Ill., Harney B. Stover, Davis & Kuelthau, Milwaukee, Wis., David G. Davies, Ray, Robinson, Hanninen & Carle, Cleveland, Ohio, for plaintiffs-appellants.

Grant F. Langley, Rudolph M. Konrad, Office of the City Attorney, Milwaukee, Wis., for defendant-appellee.

Before CUDAHY, POSNER and FLAUM, Circuit Judges.

CUDAHY, Circuit Judge.

In a heavy storm on Christmas Eve of 1979, the SS EM FORD, a self-unloading bulk cement carrier loaded with 5,700 tons of bulk cement, tore loose from its moorings, battered against the headwall of its berth and eventually sank to the bottom of the Milwaukee Harbor. Following this disaster, the FORD's owner, the Cement Division of the National Gypsum Company, along with the hull and cargo insurers of the ship, [referred to collectively as "National Gypsum"] sued the City of Milwaukee in admiralty. National Gypsum claimed that the City had breached its obli-

gations as a wharfinger by assigning the FORD to a slip it knew to be unsafe in heavy winds and by negligently failing to warn National Gypsum of the hidden dangers in the berthing slip it assigned to the FORD. National Gypsum sought over $6,500,000 in compensatory damages. The City of Milwaukee denied fault and alleged contributory negligence on the part of National Gypsum, seeking to recover $250,000 for damage caused to its dockwall and other property by the FORD's battering during the Christmas Eve storm.

After a motion by the City, the district court disqualified National Gypsum's original attorney and his law firm because of potential conflicts. At a bifurcated trial on the issue of liability, the district court found National Gypsum to be 96% negligent and the City to be 4% negligent. This interlocutory appeal in admiralty followed under 28 U.S.C. section 1292(a)(3). Damages are to be determined later. We reverse the district court's allocation of fault and find that we lack jurisdiction, at this time, to review the district court's disqualification order.

## I. Facts

Our tale begins on November 15, 1979, when National Gypsum's Fleet Captain, Eugene P. Stafford, telephoned Stanley Blawas, an Assistant Dock Superintendent of the Milwaukee Harbor, requesting a winter lay-up berth for the FORD. Assistant Dock Superintendent Blawas offered the FORD a berth at Terminal No. 4 in South Slip No. 3 in Milwaukee's outer harbor. Captain Stafford inquired about the safety of the slip before accepting the berth, but was assured by Blawas that the berth was safe.

Before it had a chance to berth at Terminal No. 4, National Gypsum changed the FORD's winter mooring orders. Instead of mooring at Terminal No. 4 in the outer harbor, the FORD was ordered to wait in the harbor for its sister ship and then dock at National Gypsum's own terminal in Milwaukee's inner harbor. After being apprised of the change in the FORD's plans, Assistant Dock Superintendent Blawas of-

fered to let the FORD tie up temporarily at Terminal Pier No. 1 in South Slip No. 1 in the outer harbor while the FORD was waiting for its sister ship. Before accepting the offer of South Slip No. 1, Patrick Gallagher, captain of the FORD, asked Blawas about the depth of the water in the slip and about the availability of electric power. He did not ask about the safety of South Slip No. 1.

After accepting the berth, Captain Gallagher consulted the 1979 *United States Coast Pilot* to see what it had to say about the harbor. This maritime source contained no warnings of hazardous wave surges in Milwaukee's outer harbor, but did note that the breakwater in the harbor could be obscured during heavy waves. From 1912 to 1966 (some 13 years before the sinking of the FORD), one of the appellants, the Great Lakes Protective Association, published the winter mooring regulations of the United States Salvage Association in its annual reports. These regulations provided that winter mooring would not be approved in Milwaukee's outer harbor because of the danger of wave surges from northeasterly winds. The district court found that National Gypsum was aware of these mooring regulations. In addition, Marine surveyor William Wade testified that he had informed National Gypsum in December of 1979 that ships berthed in Milwaukee's outer harbor were subject to heavy surges during storms with strong northeasterly winds. National Gypsum denies that it received this warning. The district court found otherwise.

The FORD's captain, although quite experienced, had never seen or apparently heard of dangerous wave surges in Milwaukee's outer harbor. The district court thought that the possibility of wave surges could have been predicted from the construction of the berth and from the captain's previous experience mooring in other harbors. It is clear from previous claims and from records of wave heights kept by the City, however, that the City had actual knowledge that mooring in the outer harbor—especially in South Slip No. 1—was unsafe during heavy storms. Despite this

knowledge, the City failed to warn either the crew of the FORD or National Gypsum of any possible danger to the FORD.

Before long, National Gypsum was to change the FORD's orders for the last time. National Gypsum commanded the FORD, which was already berthed in South Slip No. 1, to remain in Milwaukee over the Christmas holiday and then make one more cement delivery before mooring at Milwaukee for the winter. The FORD's winter mooring lines were put out to secure the ship while the crew was on vacation.

At a meeting on the FORD on the morning of December 22, 1979, Captain Gallagher informed Assistant Dock Superintendent Blawas that the ship would be laying up for the holiday and that most of the crew would be gone until December 26th or 27th, but that a skeleton crew would be left aboard the FORD during the interim. Blawas warned Captain Gallagher that waves in the outer harbor could "get a little rough" if a storm came up. By "rough," Blawas testified that he meant waves of two to four feet. (Blawas conceded, however, that it was possible he had actually undercut this warning by specifying waves of one to two feet. Appellant's Appendix at 152–53.) Later that same day, Captain Gallagher discharged all but five of the crew for the holidays. In accordance with National Gypsum's practice while in port and with the City's practice on holidays, no one was assigned to watch the weather. And no one had the key to the ship's radio or telephone. Captain Gallagher expected the remaining crew to use a nearby pay phone in case of an emergency. An independent company was retained on call to provide extra manpower and materials as needed.

By December 24, 1979, a heavy storm had developed. Waves of up to 15 feet crashed into South Slip No. 1. At approximately 1 p.m. on that day, one of the FORD's remaining crew members realized that the FORD was from 10 to 15 feet off the dock at the stern and that the FORD was in danger. The crew called for help. The Coast Guard was contacted (but no one was available to render assistance because of the holiday). In addition, tugboats came out to assist the FORD on three different occasions, to no avail. The tugboats were unable to help the FORD because they could not communicate with it and because it had no pilot on board. Because of the severe waves, the FORD tore loose from its moorings, started pounding against the headwall of the dock, became dangerous to those trying to save it and was eventually abandoned. The FORD ultimately sank.

National Gypsum brought suit against the City of Milwaukee, claiming that the City had breached its obligations as a wharfinger by assigning the FORD to a slip it knew to be unsafe in heavy winds and by negligently failing to warn National Gypsum of the hidden dangers in the berthing slip it assigned to the FORD. National Gypsum asked for over $6,500,000 in compensatory damages. The City of Milwaukee denied fault and alleged contributory negligence on the part of National Gypsum, seeking to recover $250,000 for damage caused to its dockwall and other property by the FORD's battering during the Christmas Eve storm.

After a motion by the City, the district court disqualified National Gypsum's original attorney and his law firm because of potential conflicts. After the liability phase of a bifurcated trial, the district court found that National Gypsum was negligent and at fault: for laying up the FORD at South Slip No. 1, for failing to employ or retain a standby master or pilot and crew members aboard who could navigate the vessel, for failing to maintain ship-to-shore radio-telephone communications and for failing to monitor the weather. The district court found the City negligent and at fault: for allowing the vessel to temporarily lay up at South Slip No. 1, for failing to warn the ship that wind and wave conditions could develop which would endanger the vessel and the City's dockwall and for failing to order that the ship remain manned or move off the berth. The district court also found that the City had breached a wharfinger's implied warranty of offering safe berths. The court apportioned 96% of the fault to National Gypsum and 4% to the City, a ruling which essen-

tially left both parties to bear their own losses.

On appeal, National Gypsum argues essentially that: (1) the district court erred in not finding the City 50% at fault because the City's actions constituted either wanton negligence or negligence greater than 4%; and (2) that the district court's ruling disqualifying National Gypsum's original attorney and his law firm was clearly erroneous. The City has not cross-appealed. We find that we do not have jurisdiction to review the district court's disqualification order, but reverse the district court's allocation of fault.

## II. DISCUSSION

### A. Pendent Appellate Jurisdiction over the Disqualification Order

The first issue before us is whether this court has jurisdiction to hear an appeal from the district court's disqualification order. Normally, interlocutory orders are not appealable. 28 U.S.C. section 1292(a)(3), however, empowers us to hear "[i]nterlocutory decrees of [ ] district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed."

 National Gypsum contends that we have statutory jurisdiction to review the merits of the district court's disqualification order (1) because the disqualification order is a final order with respect to the issue of liability and apportionment of fault between the parties or (2) because the disqualification order is an adverse determination on the substantive right of National Gypsum to be represented by the counsel of its choice. Despite National Gypsum's arguments to the contrary, it is clear that this court does not have statutory jurisdiction to hear an appeal from the district court's disqualification order. The order does not "determin[e] the rights and liabilities of the *parties.*" (emphasis supplied) Rather, it merely disqualifies National Gypsum's original lawyer and his law firm. The district court's order apportioning liability between National Gypsum and the

City of Milwaukee, on the other hand, is an appealable interlocutory order in admiralty.

This court does have the ability to review some interlocutory orders—even though it may lack the statutory jurisdiction to do so—under the doctrine of pendent appellate jurisdiction. Under this doctrine, "an order not itself appealable, but closely connected to an order that is appealable, may be reviewed as a pendant to the latter order." *Patterson v. Portch,* 853 F.2d 1399, 1403 (7th Cir.1988). The doctrine is very limited in scope since an expansive application of the pendent appellate jurisdiction doctrine would severely undercut the purposes behind the final judgment rule. *Id.* Hence, we have held that "[w]hen an ordinarily unappealable interlocutory order is *inextricably entwined* with an appealable [ ] order, the former may be reviewed at the same time *if, but only if,* there are *compelling reasons* for not deferring the appeal of the former order to the end of the lawsuit, at which time all previous orders are appealable together with the final judgment." *Illinois ex rel. Hartigan v. Peters,* 861 F.2d 164, 166 (7th Cir.1988) (emphasis supplied).

We find that the requisite "compelling reasons" are absent in this case. The district court's disqualification order is not "inextricably entwined" with the district court's allocation of fault. Indeed, the two issues are actually unrelated (although the court's ruling on the former may have had some effect upon the latter).

National Gypsum contends, however, that it is in the "best interests of justice" to review the district court's disqualification order now, at the conclusion of the liability phase. (If the disqualification order were reversed after the damages phase is completed and a final judgment entered, the whole case would presumably have to be retried.) We do not find National Gypsum's judicial economy argument, in this context, to be persuasive. An erroneous evidentiary ruling may persuade a litigant to waive a (fundamental) constitutional right, but the evidentiary ruling cannot normally be appealed until there has been a final judgment. If the ruling were errone-

ous and the error prejudicial, much judicial effort would probably have been wasted. But, the final judgment rule prevails, nevertheless. In short, we see no special reason why we should depart from the normal final judgment rule or expand the doctrine of pendent appellate jurisdiction (and undercut the final judgment rule) to fit this situation.

### B. The Allocation of Fault

In *United States v. Reliable Transfer Co.*, 421 U.S. 397, 411, 95 S.Ct. 1708, 1715–16, 44 L.Ed.2d 251 (1975), the Supreme Court held that "when two or more parties have contributed by their fault to cause property damage in a maritime collision ..., liability for such damages is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault." This rule provides the backdrop we must use to analyze this case.

 Our standard of review is well settled. This court may not set aside the judgment of a district court sitting in admiralty unless that judgment is found to be clearly erroneous. *McAllister v. United States*, 348 U.S. 19, 20, 75 S.Ct. 6, 7, 99 L.Ed. 20 (1954). The clearly erroneous standard of review applies to an admiralty court's apportionment of fault in accordance with comparative negligence principles in collision cases. *See, e.g., Barnett v. Sea Land Service, Inc.*, 875 F.2d 741, 745 (9th Cir.1989). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

We think that the district court's thorough and largely well reasoned opinion in this case is basically correct. Our review of the record leads us to the conclusion that the district court was right when it found both National Gypsum and the City

of Milwaukee to be at fault in the sinking of the FORD on that fateful Christmas Eve. Moreover, we think it clear, as did the district court, that the fault of National Gypsum was more egregious than the fault of the City. We must, however, take issue with the district court's allocation of fault in this case.

The district court held Cement Division to be 96% at fault and the City to be 4% at fault. These numbers are odd. It appears that the district court apportioned liability according to the amount of property each side had at risk. Memorandum Opinion and Order of June 30, 1989, at 134 ("The plaintiffs also had the costlier property at risk with the foreseeable result being that the damages claimed by the plaintiff are twenty-six times as great as those claimed by the defendant."). Hence, the 96% and 4% figures (25/26 = .9615). These calculations, however they were arrived at, have left us with a "definite and firm conviction that a mistake has been committed."

 Under the doctrine of comparative negligence, a party's share of liability should not depend upon how valuable his property at risk was. But, this is what the district court appears to have done in this case. Instead, the doctrine of comparative negligence is generally supposed to be used to assess liability in proportion to the cost of avoiding the entire accident to each side. Because the district court's allocation of fault was based upon an incorrect application of comparative negligence principles or because the district court failed to adequately explain how it arrived at its result, we cannot accept its apportionment of liability.

 Although we could remand the case for a redetermination of fault, we need not do so. We believe that, on the facts of this case, no reasonable trier of fact could apportion more than two-thirds of the liability to National Gypsum.

With respect to information about the danger to the FORD, it seems clear that Assistant Dock Superintendent Blawas had more detailed and specific information about the wave conditions in the harbor

than did Captain Gallagher. It would have been relatively costless for Blawas to have been more forthright about the wave conditions in the slip. It would also have been relatively costless for Blawas to ask more searching questions regarding Captain Gallagher's lay-up plans for the FORD. On the other hand, it would have been relatively costless for Captain Gallagher to have undertaken at least some investigation on his own or to have more closely questioned Blawas's assurances.

Once the FORD was berthed and laid-up, however, National Gypsum was really the only party that could have undertaken some effort to keep the FORD from danger. Captain Gallagher could, for example, have left the radio-telephone in operation or he could have left a competent master aboard to move the vessel in case danger arose. Neither of these precautions would have been very costly. (The City could have ordered the FORD to move once the storm came up, but without adequate manpower, such a directive would have rung hollow.) We think that there is great wisdom in the view that a captain is ultimately responsible for the welfare of his ship. Because Captain Gallagher's actions essentially left the FORD a sitting duck, National Gypsum must bear more of the ultimate fault for the FORD's demise than the City. *See Boudoin v. J. Ray McDermott & Company*, 281 F.2d 81, 84–85 (5th Cir.1960). Because of the distribution of the cost of avoidance in this case, no reasonable trier of fact could apportion more than two-thirds of the liability to National Gypsum. Through the judgment below, the trier of fact displayed a willingness to apportion at least this much of the award to National Gypsum. In deciding the case as we do, we therefore merely confine the decision of the district judge to the upper limit of his discretion and apportion liability two-thirds to National Gypsum and one-third to the City of Milwaukee.

### III. CONCLUSION

For all the foregoing reasons, the appeal from the district court's disqualification order is DISMISSED for lack of jurisdiction.

The district court's allocation of fault is REVERSED. National Gypsum is adjudged to be two-thirds at fault while the City of Milwaukee is adjudged to be one-third at fault for the damage to the City's property and for the sinking of the SS EM FORD. May she rest in peace.