Charles WEST, Appellant,

v.

CITY OF ST. PAUL, Appellee.

No. S–6762.

Supreme Court of Alaska.

April 11, 1997.

Michael W. Flanigan, Walther & Flanigan, Anchorage, Charles W. Ray, Jr., Anchorage,

and David Paul Bains, Hilleren & Bains, New Orleans, LA, for Appellant.

Michael L. Bono and Brewster H. Jamieson, Lane, Powell, Spears, Lubersky, Anchorage, for Appellee.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH, and FABE, JJ.

*OPINION*

EASTAUGH, Justice.

I. *INTRODUCTION*

Charles West was the engineer of the F/V Alaskan Monarch, a ninety-six foot crabber. He sued the City of St. Paul for injuries he suffered while abandoning the ship when it became trapped in ice and was driven aground outside the City's harbor. The superior court, concluding that the City's harbormaster owed no duty to warn of ice conditions outside the harbor, dismissed West's suit. West appeals. We affirm.

II. *FACTS AND PROCEEDINGS*

On March 14, 1990, the F/V Alaskan Monarch was enroute to the St. Paul harbor to deliver 100,000 pounds of crab to Pribilof Island Processors (PIP). When it was six to eight miles from the harbor, its captain, Morris Hansen, radioed PIP for an unloading time. PIP gave Hansen a 9:00 a.m. unloading time. At this point, the vessel had encountered no ice. Hansen then called the St. Paul harbormaster to request clearance into the harbor. The harbormaster was employed by the City of St. Paul.

The City conceded for the purpose of its summary judgment motion that clearance was given. Brett Wagner, a PIP employee, swore in an affidavit that he overheard the harbormaster give Hansen clearance to enter the harbor. Wagner further affied that when he heard the conversation over his portable radio, he could see the harbor and the harbormaster's office and did not see the harbormaster visually inspect the harbor.

The Alaskan Monarch continued toward the harbor; it encountered an ice floe about one and one-half miles from the harbor entrance.[1] Hansen called the harbormaster again and asked him to tell PIP that ice conditions would cause the Alaskan Monarch to be late. The harbormaster did not inform Hansen that there were any hazardous ice conditions in the harbor or that any vessels were stuck in pan ice in the harbor. The Alaska Mist, a 300–foot processing vessel, was exiting the harbor, and in doing so cleared a path to the harbor entrance. In an attempt to reach the harbor, Hansen piloted the Alaskan Monarch into the wake of the Alaska Mist. The Alaskan Monarch, however, traveled only another quarter of a mile before becoming caught in the ice.[2]

After the ice trapped the vessel, Hansen radioed a call for help to other vessels and learned that a number were also stuck or unable to come to his assistance. Throughout the rest of that day and the next, the crew tried to free the vessel from the ice and fix the damage already done by the jagged ice.

Hansen radioed a Mayday signal when weather conditions worsened on March 15. The Alaskan Monarch was then getting very close to shore. A U.S. Coast Guard cutter attempting to help was unable to secure a towline to the vessel. A Coast Guard helicopter lifted four crew members off the vessel, leaving only Hansen and West aboard for

---

1. There was a dispute about where the Alaskan Monarch first encountered ice; Hansen's estimate, that it was one and one-half miles from the harbor entrance, is more favorable to West's position. Because we take all reasonable inferences in favor of the non-movant, West, we use Hansen's estimate of one and one-half miles. *See Newton v. Magill,* 872 P.2d 1213, 1215 (Alaska 1994).

2. The distance from the harbor to the point where the Alaskan Monarch became stuck is not clear. The superior court's opinion appears to assume ice trapped the Alaskan Monarch between one, and one and one-quarter miles from the harbor. The City cites to Hansen's and West's depositions to support a distance of six-tenths of a mile. In his deposition, Captain Hansen used that figure to approximate how close the Alaskan Monarch was getting to a jetty when he made the decision to stop trying to maneuver the vessel out of the ice. In his deposition, West testified that the Alaskan Monarch was roughly 200 yards from the harbor when Hansen attempted to turn the vessel around and they realized they were in trouble.

a final attempt to save the ship. Soon after, the vessel went aground on a jetty near the harbor entrance and was holed in its bow. Hansen then asked the helicopter to lift West and himself from the stricken boat. While they were moving to the bow where they could be lifted from the deck, a wave knocked them overboard. West was injured. The Coast Guard eventually pulled both men from the water.

West sued the vessel and Hansen on maritime theories. He also sued the City of St. Paul, alleging that its harbormaster negligently gave the vessel clearance to enter the harbor and failed to warn of dangerous ice conditions. The City successfully moved for summary judgment. The court denied West's reconsideration motion and entered final judgment for the City. West appeals.

## III. *DISCUSSION*

### A. *Standard of Review*

In reviewing a grant of summary judgment, this court must determine whether genuine issues of material fact exist, drawing all inferences in favor of the opposing party, and whether any party is entitled to judgment as a matter of law. *Newton v. Magill,* 872 P.2d 1213, 1215 (Alaska 1994) (citing *Sea Lion Corp. v. Air Logistics of Alaska, Inc.,* 787 P.2d 109, 116 (Alaska 1990); *Wassink v. Hawkins,* 763 P.2d 971, 973 (Alaska 1988)). "When reviewing questions of law, this court applies its independent judgment." *Estate of Lampert Through Thurston v. Estate of Lampert Through Stauffer,* 896 P.2d 214, 218 (Alaska 1995) (citing *Summers v. Hagen,* 852 P.2d 1165, 1169 (Alaska 1993)). Under this standard, we adopt "the rule of law which is most persuasive in light of precedent, policy and reason." *Summers,* 852 P.2d at 1169 (citing *Guin v. Ha,* 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

### B. *Scope of Wharfinger's Duty to Warn of Ice Conditions*

West asserts that the City, through its function as a wharfinger,[3] owed to inbound

vessels a duty to warn of ice conditions within the harbor; he claims that the City negligently breached this duty when its harbormaster gave clearance to the Alaskan Monarch to enter the harbor and did not inform her captain of those conditions. The City argues that a wharfinger's duties pertain to providing a safe berth, and do not extend to areas outside the wharf or harbor and do not include a duty to warn of open and obvious sea and weather conditions.

*Smith v. Burnett,* 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (1899), is recognized as the seminal case on the issue of the duties of a wharfinger. Michael S. Cessna, *The Mutual Rights and Obligations of Wharfingers and Shipowners,* 19 J.Mar.L. & Com. 565, 565 (1988) (hereinafter *Mutual Rights and Obligations* ). In *Burnett,* the Court stated:

> Although a wharfinger does not guaranty the safety of vessels coming to his wharves, he is bound to exercise reasonable diligence in ascertaining the condition of the berths thereat, and, if there is any dangerous obstruction, to remove it, or to give due notice of its existence to vessels about to use the berths.

*Id.* at 433, 19 S.Ct. at 443.

Therefore, a wharfinger must warn the ship captain about such hidden dangers as underwater obstacles in the approach and latent structural defects in the wharf. *See, e.g., Burnett,* 173 U.S. 430, 19 S.Ct. 442, 43 L.Ed. 756 (duty to warn of the depth limitations at the berth); *Medomsley Steam Shipping Co. v. Elizabeth River Terminals,* 354 F.2d 476 (4th Cir.1966) (duty to warn of defective mooring cleat); *The Cornell No. 20,* 8 F.Supp. 431 (S.D.N.Y.1934) (duty to warn of sunken vessel lying in the approach to wharf).

It is well established that a wharfinger has no duty to warn of open and obvious conditions that can be reasonably ascertained

---

**3.** A wharfinger is "the owner or occupier of a wharf." *Black's Law Dictionary* (6th ed. 1990). *See Bangor & A.R.R. v. Ship Fernview,* 455 F.Supp. 1043, 1062 n. 52 (D.Me.1978). The parties agree that the City, through its harbormaster, was a wharfinger and that the harbormaster's alleged negligence is determined by federal maritime law principles governing wharfinger liability.

by a vessel. *See, e.g., Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790 (5th Cir.1977) (holding that a wharfinger's duty to warn only applies to hidden hazards or deficiencies not reasonably known to the shipowner), *cert. denied,* 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978); *Mutual Rights and Obligations, supra,* at 568–69 ("[A] wharfinger is only required to warn the vessel of hidden dangers known to the wharfinger, or which the exercise of reasonable care and an inspection should have made known to him.").

■ Because most weather conditions are open and obvious, and can be discovered with reasonable diligence, a wharfinger does not have a duty to warn of such dangers. *See, e.g., Pacific Alaska Fuel Servs. v. M/V Miyoshima Maru,* 1994 AMC 2601, 1994 WL 739434 (D.Alaska 1994) (no duty to warn of existing conditions of tide, current, or weather); *Bangor & A.R.R. v. Ship Fernview,* 455 F.Supp. 1043, 1062 (D.Me.1978) ("[A] wharfinger is under no duty to advise an approaching vessel of weather reports ... which are readily apparent to the ship."); *Bunge,* 558 F.2d at 799–800 (refusing to find a wharfinger negligent for urging a vessel to dock at night and in the fog).

■ Ice floes are an open and obvious condition. The superior court held that the City had not breached a duty to the Alaskan Monarch because "[i]ce conditions inside and outside the harbor were open and obvious meteorological phenomena." *The Linseed King,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932), lends support to our conclusion that the ice conditions encountered by the Alaskan Monarch were not hidden hazards or latent defects. The Court found that ice conditions "could have been ascertained ... if he had used reasonable diligence" and thus held that an employer had privity of knowledge of the ice conditions of the river across which his employees were ferried to work. *Id.* at 512, 52 S.Ct. at 453.

With reasonable diligence, the Alaskan Monarch could have learned of prevailing meteorological conditions outside the harbor. The Alaskan Monarch was in contact with PIP and other vessels. The record indicates that Captain Hansen was aware of the ice conditions when the Alaskan Monarch was proceeding towards the harbor but before it became stuck. At a point where Hansen characterized the ice as being "[n]ot too bad" at the Alaskan Monarch's location, he knew that at least one vessel further in was trapped. He decided to proceed anyway. Because Hansen possessed sufficient information to put him on notice of the conditions, and because he could have obtained more information with reasonable diligence, the ice was not a hidden hazard.

West claims that ice is categorically different from other meteorological conditions because "a vessel might find itself imperiled before it can reverse course." West's recitation of the facts belies that argument. According to West, when the Alaskan Monarch first encountered ice West suggested to Hansen that they reverse course and offload at an ocean-going tender. Hansen, who received but rejected West's suggestion, and who attempted to reach the harbor through the ice by following the wake of a larger outbound vessel, was necessarily aware of the conditions when he made his navigational decisions. Such decisions are within the special purview of the ship's master, and a wharfinger has no duty to invade this area of expertise to warn of possible dangers. *See, e.g., Brown v. Link Belt Div. of FMC Corp.,* 666 F.2d 110, 113 (5th Cir.1982) ("These cases reflect the court's recognition that normally the master of a ship has the final say so in deciding what risks posed by the weather and the condition of his ship will be assumed.") (citing *The Linseed King,* 285 U.S. at 511–12, 52 S.Ct. at 452–53); *Bunge,* 558 F.2d at 802 ("Those in control of the vessel's navigation must bear the greater responsibility for bringing their ship safely into and out of port. The dock owner's liability should extend only so far as the vessel's master could not have averted an accident.").

In support of his argument that the wharfinger had a duty to warn of the ice conditions, because the ice was a latent or hidden hazard, West cites *Cement Division, National Gypsum Co. v. City of Milwaukee,* 915 F.2d 1154 (7th Cir.1990), *cert. denied,* 499 U.S. 960, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991). In that case, the court apportioned liability at two-thirds for the shipowner and

one-third for the wharfinger after a ship tore loose from its moorings in an outer harbor slip during a violent winter storm. West argues that *National Gypsum* shows that there are particular weather-related circumstances that will give rise to the duty to warn, if the meteorological hazard is not the type that would be apparent to the shipmaster.

The City counters that *National Gypsum* did not premise its finding of wharfinger liability on a duty to warn of weather conditions; rather, the City argues, liability flowed from a breach of the most elemental of a wharfinger's duties, the duty to furnish a safe berth.

In *National Gypsum*, the Seventh Circuit upheld the district court's finding of wharfinger negligence "for failing to warn the ship that wind and wave conditions could develop which would endanger the vessel ... and for failing to order that the ship remain manned or move off the berth." 915 F.2d at 1157. In upholding the lower court's findings of negligence and breach of warranty for a safe berth, the court imposed no duty to warn of conditions that could arise outside the harbor and assigned slip. *Id.* It is reasonable to read *National Gypsum* as the City proposes, i.e., liability there arose from the wharfinger's duty to provide a safe berth. The case does not stand for a general duty to warn of weather conditions. (*National Gypsum* would not support West's position in any event because the Alaskan Monarch became entrapped in ice well outside the harbor entrance.)

We conclude that the harbormaster had no duty to warn the Alaskan Monarch of the danger of the ice, because the ice was an open and obvious meteorological condition.

### C. *Evidence of Custom and Practice*

■ West contends that the superior court failed to consider "custom and practice" evidence about granting clearances into the harbor.

To avoid summary judgment once a movant has made out a prima facie case, the nonmovant must set forth specific facts reasonably tending to dispute or contradict the movant's evidence and demonstrating the existence of a material issue of fact. *Howarth v. First Nat'l Bank of Anchorage*, 540 P.2d 486, 489–90 (Alaska 1975); Alaska R. Civ. P. 56(e). Conclusory statements in opposing affidavits are not sufficient to defeat a summary judgment motion.[4] *Ratcliff v. Security Nat'l Bank*, 670 P.2d 1139, 1142 n. 6 (Alaska 1983). *See also Taylor v. List*, 880 F.2d 1040, 1045 n. 3 (9th Cir.1989).

We have recognized custom in other maritime cases where it is supported by the record. *Jensen v. Goresen*, 881 P.2d 1119, 1122–23 (Alaska 1994) (recognizing that seine fishers in Alaska have a custom of never entering another vessel's circled seine). Custom is defined as

> [a] usage or practice of the people, which by common adoption and acquiescence, and by long and unvarying habit has become compulsory, and has acquired the force of law with respect to the place or subject matter to which it relates. It results from a long series of actions, constantly repeated, which have, by such repetition and by uninterrupted acquiescence, acquired the force of a tacit and common consent.

*Black's Law Dictionary* 385 (6th ed. 1990) (citation omitted).

The evidence of custom and practice which West contends the superior court improperly failed to consider consists of a statement in the affidavit of PIP's plant manager Brett Wagner that

> The custom and practice in St. Paul harbor in March 1990 was that clearance to enter St. Paul harbor would not be given if ice conditions prevented a safe entry into the harbor.

West relies solely on this conclusory passage and did not produce specific facts to support the existence of a genuine issue of fact. Given well-established limits on a wharfinger's duty to warn, such a conclusory assertion is

4. On this issue, the City cites *Lipari v. Kawasaki Kisen Kaisha, Ltd.*, 1991 AMC 2645, 2648–49, 1991 WL 3060 (9th Cir.1991) (ruling that a conclusory statement was not enough to establish a custom in a maritime case). Because *Lipari* is an unpublished memorandum decision issued under Ninth Circuit Rule 36–3, we do not cite it for support on this issue.

insufficient to establish a genuine fact dispute about any assumption of a duty extending beyond the harbor. The superior court did not err in refusing to infer the existence of a custom and took all reasonable inferences in favor of the non-movant, West.[5]

## IV. CONCLUSION

Because the ocean ice was an open and obvious condition for which a wharfinger has no duty to warn, we AFFIRM the superior court's grant of summary judgment against Charles West.

5. West also argues that the superior court only acknowledged one of three conversations that occurred between the Alaskan Monarch and the harbormaster and did not consider evidence of the allegedly hung-over condition of the harbormaster. Because we find that the wharfinger owed no duty to the Alaskan Monarch, these facts are not material and were properly ignored by the superior court.