In re CLEVELAND TANKERS, INC., as owner and operator of the M/V "JUPI-TER," for exoneration from or limitation of liability.

NEW CONNECTICUT BANK & TRUST, et al., Plaintiffs,

v.

Abdul MUSSA, et al., Appellees,

Cleveland Tankers, Incorporated; Total Petroleum, Incorporated, Defendants–Appellees,

American Steamship Company, Defendant–Appellant.

No. 93–1925.

United States Court of Appeals, Sixth Circuit.

Argued April 10, 1995.

Decided Oct. 19, 1995.

Rehearing Denied Nov. 21, 1995.

**1202**

C. Peter Theut (briefed), Butzel, Long, Gust, Klein & Van Zile, Detroit, MI, Warren J. Marwedel, Chicago, IL, for Fireman's Fund Ins. Companies.

Paul D. Galea (argued and briefed), Foster, Meadows & Ballard, Detroit, MI, for Cleveland Tankers, Inc.

Richard J. McClear (briefed), Dykema & Gossett, Detroit, MI, for Total Petroleum, Inc.

Daniel S. Saylor (briefed), Garan, Lucow, Miller, Seward, Cooper & Becker, Detroit, MI, Thomas W. Emery (argued), Detroit, MI, for American S.S. Co.

Before NELSON, BOGGS, and GIBSON,* Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

American Steamship Company, owner of the bulk carrier ship, the *Buffalo*, appeals from a judgment holding it liable for fifty percent of the damages from an explosion that occurred when the *Buffalo* passed the *Jupiter*, a tankship that was moored and unloading its cargo of gasoline. As the *Buffalo* passed, the *Jupiter* swung loose from its dock, rupturing both the hose transferring the gasoline to the shore and an electrical cord leading from shore to the ship. A spark from the ruptured cord ignited the spilled gasoline and caused the Jupiter's cargo of gasoline to explode. American Steamship argues that the district court[1] used a legal standard of care applicable only to passing a properly moored ship, whereas the *Jupiter* was improperly moored. American Steamship also claims that the district court erred in apportioning liability between American Steamship; Total Petroleum, Inc., the wharfinger; and Cleveland Tankers, Inc., owner of the *Jupiter*.[2] Finally, American Steamship

---

* The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan.

2. Fireman's Fund Insurance Companies is also an appellee. It insured the *Jupiter's* cargo, and is subrogated to Total's claim for the lost cargo.

contends that the district court erred in excluding from evidence the analysis and conclusions section of the Coast Guard report on the accident. We affirm.

On September 16, 1990, at 1:45 in the morning, the *Jupiter* moored at the Total Petroleum facility on the Saginaw River in Bay City, Michigan to unload its cargo of 56,000 barrels of gasoline.

The *Jupiter*'s crew moored the ship with six lines: four wire rope cables attached to winches on the *Jupiter* and two polypropylene lines. The crew began unloading the gasoline to Total's shore facility by pumping it through a hose running from the ship to a pipe on shore. The *Jupiter*'s crew monitored the progress of the cargo transfer by means of "ullage pipes," openings from the deck to the hold that permitted the crew to gauge the contents of the hold. There was a "motor-operated valve" to shut off the pipeline on shore from the tanks behind it; the controls to the motor-operated valve were at the end of an electrical cord that was draped over a rail on the *Jupiter*.

During the early morning hours of September 16 another ship, the *Clymer*, passed the *Jupiter* without incident.

Later that morning, the *Buffalo* entered the Saginaw River from Lake Huron and started upstream toward the *Jupiter*. The speed at which the *Buffalo* was going as it approached and passed the *Jupiter* is the subject of a great deal of conflicting testimony, both eyewitness and expert. As the *Buffalo* approached the *Jupiter*, the water level rose about four feet, causing the *Jupiter* to surge forward slightly, then backward. As the *Buffalo* passed abeam of the *Jupiter*, the *Jupiter* surged forward so that the hindmost mooring wire (the "number four" wire) tautened. The number four wire was moored to the center piling (the "kingspile") on the "number four" cluster of pilings. When the number four wire grew too taut, the number four kingspile snapped, releasing both the number four wire and one of the polypropylene lines and leaving the *Jupiter* without any moorings at its stern. The stern swung out away from the dock, stretching the cargo hose until it also broke, spilling its contents (120–300 gallons of gasoline) on the pier and on the *Jupiter*'s deck. At the same time, the electric cord for the motor-operated valve stretching from the wharf to the ship broke and spewed sparks that ignited the spilled gasoline on the pier. Fire quickly spread from the pier along the cargo hose to the *Jupiter*'s deck. The fire traveled through the ullage pipes to the cargo, causing three explosions.

Several men were injured and one drowned. The *Jupiter* and her cargo were lost and the Total Petroleum pier was damaged in the fire.

■ American Steamship and Cleveland Tankers both filed for limitation of, or exoneration from, liability under 46 U.S.C.App. § 183(a) (1988), the Limitation Act. Under the Limitation Act, a ship owner is entitled to exoneration if he, his vessel, and crew are found to be completely free of fault. *In re Complaint of Caribbean Sea Transport, Ltd.*, 748 F.2d 622, 626 (11th Cir.1984), *modified on other grounds*, 753 F.2d 948 (11th Cir. 1985). Even if not completely free from fault, the ship owner is entitled to limitation of liability if the ship owner had no knowledge of or privity to the ship's negligence or unseaworthiness. *S & E Shipping Corp. v. Chesapeake & Ohio Ry. Co.*, 678 F.2d 636, 642 (6th Cir.1982); *Matter of M/V Sunshine, II*, 808 F.2d 762, 764 (11th Cir.1987). The burden of proving negligence lies on the person claiming to be injured, but once negligence is established, the vessel's owner must prove lack of knowledge or privity to the negligence. *Id.*

After a twenty-nine-day trial, the district court held that the *Buffalo* was negligent in going too fast as it passed the *Jupiter* and that the surge due to the excessive speed caused the accident. The district court held that Total Petroleum and Cleveland Tankers were also negligent and that their negligence contributed to the accident. Total Petroleum owned and maintained the pier. The pier's number four kingspile, which broke, was 90–95% rotten. The court specifically found that the dry rot in the kingspile was a proximate cause of the accident and that Total had unreasonably failed to discover the dry rot before the accident. The court also found

the *Jupiter* was unseaworthy because the flame screens in the ullage pipes, which were intended to protect the cargo from fire on deck, were not fitted closely enough in the pipe to carry out their intended function. Furthermore, the court found that the *Jupiter*'s crew was negligent in failing to close the caps on the ullage pipes while the *Buffalo* passed, and that this failure contributed to the accident by providing a pathway for the flames from the deck to the cargo. The court found that neither Cleveland Tankers nor American Steamship had borne its burden of proving it had no privity to its vessel's negligence.

The district court apportioned liability on the basis of fault under *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The court found the distribution of fault to be fifty percent to the *Buffalo*, and twenty-five percent each to the *Jupiter* and Total Petroleum.

## I.

■■■ American Steamship's principal argument is that the district court based its finding of negligence on a standard of care that was not pertinent to the facts of this case. It argues that the court applied a presumption from *O'Donnell Transportation*

*Co. v. M/V Maryland Trader*, 228 F.Supp. 903, 909 (S.D.N.Y.1963), that a ship must proceed so as to do no harm to a properly moored vessel, whereas the defective condition of the number four kingspile made the *Jupiter* an *improperly* moored vessel. What a passing ship's duty is to an improperly moored vessel is an interesting question, as is the issue of whether a vessel is improperly moored if properly tied to a defective dock. Nevertheless, given the actual disposition of this case, those questions need not be reached. The court in this case did recite the *O'Donnell* test and did rely upon it in holding the *Buffalo* negligent. At the same time the court also found the *Buffalo* negligent using a completely independent and sufficient test, stating that if a vessel violates a written statutory or administrative rule of navigation designed to prevent collisions, the burden is on the vessel at fault to show that its violation could not have been a contributing cause of the collision. *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873). The court explicitly found that "the *Buffalo* passed by the *Jupiter* at an excessive rate of speed in violation of the Inland Navigation Rules Act, the Navigation Safety Regulations,[3] the Michigan Marine Safety Act, the Bay City Code, and the ordinances of the Township of Bangor and the City of Essexville." [4]

---

**3.** The court applied 33 C.F.R. § 164.11 (1990), which provided:

The owner, master, or person in charge of each vessel underway shall ensure that:

(p) The person directing the movement of the vessel sets the vessel's speed with consideration for:
  (1) The prevailing visibility and weather conditions;
  (2) The proximity of the vessel to fixed shore and marine structures;
  (3) The tendency of the vessel underway to squat and suffer impairment of maneuverability when there is small underkeel clearance;
  (4) The comparative proportions of the vessel and the channel;
  (5) The density of marine traffic;
  (6) The damage that might be caused by the vessel's wake;
  (7) The strength and direction of the current; and
  (8) Any local vessel speed limit.

**4.** The court took notice of the relevant provisions of local law:

At trial, this Court took judicial notice of certain state statutes and local ordinances governing vessel speed. The BUFFALO was subject to the Michigan Marine Safety Act, Mich.Comp. Laws § 281.1001, *et seq.*, which provides for the enactment of local ordinances regulating the use of vessels. The Act provides, in part:

A person operating or propelling a vessel upon the waters of this state shall operate it in a careful and prudent manner and at such a rate of speed so as not to endanger unreasonably the life or property of any person. A person shall not operate any vessel at a rate of speed greater than will permit him, in the exercise of reasonable care, to bring the vessel to a stop within the assured clear distance ahead. A person shall not operate a vessel in a manners [sic] so as to interfere unreasonably with the lawful use by others of any waters.

Mich.Comp. Laws § 281.1072. The Act further defines a "slow—no wake speed" as "a very slow speed whereby the wake or wash created by the vessel would be minimal." Mich.Comp. Laws § 281.1008(b).

■ The court found that the *Buffalo's* violation of these rules in passing at excessive speed was "a proximate cause of the accident which occurred on September 16, 1990." Specifically, the court found that the explosion resulted from the rupture of the gasoline hose and electrical lines, which in turn resulted from the *Jupiter's* response to hydrodynamic forces caused by the "speed of the *Buffalo* and the proximity with which she passed the *Jupiter*." These findings amply satisfy the *Pennsylvania* standard for liability, making it unnecessary to determine whether the court may have erred in applying the *O'Donnell* presumption to a vessel moored to a defective dock. Thus, even if the court erred in applying the *O'Donnell* test inappropriately, the *Pennsylvania* holding provides an adequate ground for its ruling. "[A] reviewing court can sustain the judgment of a lower court on any ground that finds support in the record." *United States v. Anderson County*, 761 F.2d 1169, 1174–75 (6th Cir.), *cert. denied*, 474 U.S. 919, 106 S.Ct. 248, 88 L.Ed.2d 256 (1985).

## II.

American Steamship next contends that the district court erred in finding that the *Buffalo* was traveling six to nine miles per hour as it passed the *Jupiter*, and that it created a wake.

■ We may set aside a district court's findings of fact in an admiralty proceeding only if they are clearly erroneous. *United States v. Paducah Towing Co.*, 692 F.2d 412, 421 (6th Cir.1982). "[A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (internal quotations and citation omitted).

■ The district court discussed at length the eyewitness and expert testimony on both sides of the hotly contested question about the speed of the *Buffalo* as it passed the *Jupiter*. The district court based its finding of excessive speed on the testimony of three eyewitnesses and two experts. The court specifically rejected the testimony of two eyewitnesses American Steamship relied on (one partly on the basis of his demeanor) and of the *Buffalo's* captain, MacFalda.[5] These credibility judgments are particularly the province of the district court, with only a narrow scope for appellate intervention when a district court has relied on testimony that simply cannot be believed. *See Anderson*, 470 U.S. at 575, 105 S.Ct. at 1512 ("[D]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable fact-finder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination."). This case does not present that situation. Here, the testimony of different witnesses directly contradicted each other, and the district court made a necessary choice between two versions.

The district court gave good reasons for rejecting American Steamship's expert testi-

Pursuant to the Marine Safety Act, various political subdivisions of Bay County had enacted vessel speed ordinances. While transitting the stretch of river off Total's dock, the BUFFALO was also subject to the Bay City Code. *See* Bay City Code § 23–8(b) (no watercraft may operate at speed "which causes waves to damage docks, . . . or other watercraft"). Likewise, the BUFFALO was subject to laws enacted by the City of Essexville. The City of Essexville created a water traffic ordinance effective September of 1981 to regulate the speed of vessels. Section 9.71 of the ordinance provides:

On the waters of the Saginaw River located within the City limits of Essexville, Michigan, Bay county, it is unlawful for the operator of a vessel to exceed a slow—no wake speed.
Finally, the BUFFALO was subject to Bangor Township Ordinance No. 134, Rule 5 (unlawful to exceed slow—no wake speed in waters of township). [Transcript citations omitted.]

5. The court also found that the "excessive speed of the *Buffalo* on September 16, 1990, was not an isolated event. She had developed a reputation for proceeding in the Saginaw River at such rates of speed."

mony that the *Buffalo* was traveling about three miles per hour. The court rejected the testimony both because it contradicted other expert testimony and because American Steamship's expert conceded that he failed to consider relevant factors and that the *Jupiter* would not have surged at all if the *Buffalo* had only been travelling 3.3 miles per hour.

■ American Steamship argues that the eyewitness testimony concerning excessive speed is discredited by pictures taken at the time of the accident that show no wake on the *Buffalo*'s bow. The pictures themselves demonstrate that they were taken when the *Buffalo* was well past the *Jupiter*. Of the series of twelve photographs, only one shows the bow of the *Buffalo*, partly concealed by the guard rails of a bridge. Rose Cooper, who took the pictures, testified that she and her husband had stopped their car on the bridge because the draw bridge was up. They saw the *Buffalo* coming toward them. Cooper got out of the car when she saw a flash out of the corner of her eye. She saw a fire had started and so began taking pictures. Cooper observed the *Buffalo* through the lens of her camera as it moved beyond the *Jupiter,* and the *Buffalo* seemed to be moving slowly. From studying the photographs, she concluded the *Buffalo* sped up after the fire started, because in the later pictures there was more water moving behind the boat. The district judge made no specific findings with reference to Cooper's testimony or the pictures. The essence of American Steamship's argument is that the photographs trump the testimony on which the district court based its findings. From viewing the photographs and considering the testimony before the district court, we are not persuaded that the photographs, taken after the passage and in which the relevant area (the *Buffalo*'s bow) is partially obscured, required the court to reject the eyewitness testimony concerning the wake the *Buffalo* created. A number of eyewitnesses testified that they saw a significant "swell," "draft," or "wake" on the *Buffalo*'s bow or that it was "pushing the water on [its] bow" as it passed. The pictures were not taken at the proper moment in time to require the district court to reject testimony it found to be otherwise credible.

There was ample basis for the district court's conclusion that the *Buffalo* was travelling six to nine miles per hour. Under the clearly erroneous standard, we may not reverse.

## III.

American Steamship next argues that the district court erred in apportioning fault among the *Buffalo,* the *Jupiter,* and Total Petroleum. American Steamship contends that Total's fault in failing to adequately inspect the pilings in its docks and the *Jupiter*'s fault in not closing off the ullage pipes or having better flame screens outweighed any fault of the *Buffalo*. American Steamship contends that, although the district court found the *Jupiter* negligent in leaving the ullage caps open and in using ill-fitting flame screens in its ullage pipes, the court did not recognize that the negligence of Total and the *Jupiter* changed the nature of the accident from a minor break-away incident to a catastrophic explosion. American Steamship also continues its attack on the district court's fact findings in rejecting American Steamship's other allegations of negligence by the *Jupiter*.

■ Key to our consideration of this point is the limited standard of review. The district court's apportionment of fault is subject only to review under the clearly erroneous standard, unless the court applied the wrong legal standard. *Interstate Towing Co. v. Stissi,* 717 F.2d 752, 753 (2d Cir.1983).

American Steamship makes two sorts of factual-error arguments. First, it argues that the district court erred in rejecting two of American Steamship's claims that the *Jupiter* was negligent. Specifically, American Steamship claims the district court should have found the *Jupiter* negligent in its handling of the number three winch. The court held that the *Jupiter* would not have prevented the accident by heaving on the number three winch when the ship was surging forward, since the number three wire was leading forward and heaving on it would have accelerated the forward motion. American

Steamship argues that the court should have found negligence in the handling of the winch during the *Jupiter*'s movement *backward*, before the disastrous forward surge. American Steamship claims that the computer models of Professor Armin Troesch prove that *Jupiter* crewman Skinner must have released the brake on winch number three, permitting the number three wire to unwind freely so that the *Jupiter* moved nine feet aft. Professor Troesch's computer model is based on numerous assumptions, extrapolated from the various estimates the eyewitnesses gave. Varying the values of Troesch's assumptions (e.g., whether the *Buffalo* was traveling eight miles per hour or some other speed, whether the aft surge was nine feet or some other distance) would change his results. On the other hand, Skinner's own testimony is that he did not arrive at the winch controls until the ship was moving forward and the number four kingspile was bending over, on the verge of breaking. Again, in essence, American Steamship is attempting to give preemptive weight to its expert testimony. The testimony at most simply conflicts with other evidence that the district court chose to believe. We have reviewed the underlying evidence and hold the district court's finding was not clearly erroneous.

American Steamship also argues that the court erred in failing to find that the *Jupiter* could have prevented the fire by closing the motor-operated shoreside valve and shutting off the tanks from the transfer hose. American Steamship claims that, had the *Jupiter* shut off the motor-operated valve, gasoline would not have flowed back from the tanks through the hose to spill on the deck and there would not have been enough gasoline on the *Jupiter*'s deck to fuel the fire. This argument depends on an assumption, which Cleveland Tankers disputes, that the contents of the hose would not have spilled out without back pressure from the tanks on shore.

■ In its reply brief, American Steamship switches from the argument that the gasoline would not have flowed onto the deck if the motor-operated valve had been off to the argument that the gasoline would not have flowed with as great a force as it did. This argument is not inconsistent with the district court's finding that the gasoline contained in the hose itself was sufficient to fuel the fire, which was supported by testimony at trial. The *Jupiter*'s Captain Beckwith testified that: "[A] little bit of gasoline puts off a lot of vapor and your vapor, of course, is what burns." Similarly, First Mate Walton stated: "A little bit of gas goes a long way." The record supports the district court's conclusion that the gasoline in the cargo hose was sufficient to precipitate the explosions.

American Steamship cites *Interstate Towing Co.*, 717 F.2d at 752, and *Cement Division, National Gypsum Co. v. City of Milwaukee*, 915 F.2d 1154 (7th Cir.1990), *cert. denied*, 499 U.S. 960, 111 S.Ct. 1583, 113 L.Ed.2d 648 (1991), as cases in which an appellate court reversed a district court's allocation of fault. Neither is persuasive in this case. In *National Gypsum*, the district court erred in dividing liability according to amount of property at risk, rather than fault. 915 F.2d at 1159. In *Interstate Towing*, the district court based its allocation in part on a mistaken legal conclusion that one party was only vicariously liable. 717 F.2d at 757. There is no such legal error in this case.

■ American Steamship also contends that the court erred in allocating fault among the acts of negligence, because it argues that the subsequent negligence of Total and Cleveland Tankers radically changed the nature of the accident.[6] In this case, Total was held to be negligent in maintaining a dock with a rotten piling. Total's negligence created the same danger as did the *Buffalo*'s speeding: both risked a breakaway by the *Jupiter* while transferring its flammable cargo.[7] The *Jupiter* was held negligent for leaving the ullage pipes open and for having poorly fitted frame screens in the ullage

6. American Steamship's argument sounds very much like a superseding cause defense. However, American Steamship expressly denies relying on a superseding cause theory. Therefore, the case on which American Steamship relies, *Lone Star Industries, Inc. v. Mays Towing Co.*, 927 F.2d 1453 (8th Cir.1991), a superseding cause case, is not germane.

7. The *Buffalo* had notice that the cargo was flammable because the *Jupiter* was flying a red flag so indicating.

pipes. These acts of negligence came into play only after the *Jupiter* had broken away, the hose had ruptured, and the gasoline had spilled on the deck and ignited. The risk of deck-fire and explosion was well on its way to fruition before the *Jupiter*'s negligence made its contribution to the disaster. The district court's allocation of fault is not clearly erroneous.

## IV.

Finally, American Steamship argues that the district court erred in refusing to admit the analysis and conclusions section from the Coast Guard report on the accident. *See In re Cleveland Tankers,* 821 F.Supp. 463, 465 (E.D.Mich.1992).

The Ninth Circuit held in *Huber v. United States,* 838 F.2d 398, 402–03 (9th Cir.1988), that admitting the conclusions section of a Coast Guard accident report in liability proceedings would defeat the announced purpose of 46 C.F.R. § 4.07–1(c) (1994)[8] by discouraging Coast Guard personnel from making their most candid assessments of the causes of the accident. Section 4.07–1(c) clearly indicates that the Coast Guard accident report is to be a safety-maximizing tool, not a forensic aid. *In re Complaint of Nautilus Motor Tanker Co.,* 862 F.Supp. 1251, 1256 (D.N.J.1994), decided not to follow *Huber* because the Coast Guard was not a party to the suit. That court reasoned that the rationale of *Huber* was not applicable where the Coast Guard's interests were not at risk in the proceeding. We read *Huber* more broadly, concluding that the function of the Coast Guard reports is altogether different from that of fixing liability. The Coast Guard report is, to a great extent, forward-looking, since it is meant in part to aid in developing rules to make shipping safer. *See* 46 C.F.R. § 4.07–1(c)(2). In a lawsuit, a court must look backward to facts and rules as known to the actors at the time of the accident. Introducing the Coast Guard's conclusions may confuse the two sorts of inquiries. *Huber*'s reasoning is sound and we follow it in affirming the district court's exclusion of the analysis and conclusions section in this case.[9]

\* \* \*

We affirm the judgment of the district court.

---

8. Section 4.07–1(c) provides:
   The investigation will determine as closely as possible:
   (1) The cause of the accident;
   (2) Whether there is evidence that any failure of material (either physical or design) was involved or contributed to the casualty, so that proper recommendations for the prevention of the recurrence of similar casualties may be made;
   (3) Whether there is evidence that any act of misconduct, inattention to duty, negligence or willful violation of the law on the part of any licensed or certificated man contributed to the casualty, so that appropriate proceedings against the license or certificate of such person may be recommended and taken under title 46, U.S. Code, section 239;
   (4) Whether there is evidence that any Coast Guard personnel or any representative or employee of any other government agency or any other person caused or contributed to the cause of the casualty; or,
   (5) Whether the accident shall be further investigated by a Marine Board of Investigation in accordance with regulations in subpart 4.09.

9. American Steamship's citation of *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), is not germane, since *Rainey* was decided under the hearsay rules, not under a specific regulation circumscribing the use of a particular type of government report. *See id.* at 170, 109 S.Ct. at 450.