NOT FOR FULL-TEXT PUBLICATION
File Name: 10a0426n.06

No. 09-5105

**FILED**

**Jul 14, 2010**

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

REGINA F. EDMOND; and
MINNETTA BAYRAQ,

                    **Plaintiffs-Appellants,**

v.

STATE OF TENNESSEE DEPARTMENT
OF PROBATION AND PAROLE,

                    **Defendant-Appellee.**

_____/

**ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF TENNESSEE**

BEFORE:  BOGGS, SUHRHEINRICH and ROGERS; Circuit Judges.

      **SUHRHEINRICH, Circuit Judge.**  Minnetta Bayraq ("Bayraq") appeals the district court's non-jury trial denial of her claim of retaliation, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), against the State of Tennessee Department of Probation and Parole ("STDPP").  On appeal, Bayraq argues that the district court made erroneous factual findings and wrongly determined that she had failed to establish retaliation.  Regina F. Edmond[1] ("Edmond") appeals the district court's grant of summary judgment in favor of STDPP.  The court determined that she had failed to establish a prima facie case of retaliation under Title VII because she had produced no evidence that suggested STDPP knew about her protected activity.  For the reasons set forth below, we **AFFIRM**.

_____

      [1]Some of the documents in this case incorrectly refer to the Plaintiff as Edmonds.

## I. Background

These appeals arise from a lawsuit filed by current and former female employees of STDPP: Bayraq, Edmond, and Julia Barner ("Barner"). The Plaintiffs filed suit on May 17, 2006, and amended their complaint on May 31, 2007. They alleged disparate treatment, a sexually abusive work environment, retaliation, unlawful discharge, demotion, and constructive discharge in violation of Title VII. STDPP filed a motion to dismiss all claims; only the Plaintiffs' retaliation and disparate treatment claims survived this motion.

STDPP then filed a motion for summary judgment to dispose of the two remaining claims. On September 29, 2008, the district court granted summary judgment in favor of STDPP for all of the Plaintiffs' disparate treatment claims due to their failure to establish a prima facie case. Specifically, the court determined that the Plaintiffs had failed "to establish that they were treated any differently than similarly-situated employees or to allege any timely evidence that raises an inference of discrimination." The Plaintiffs conceded that they had not presented evidence of similarly situated male employees, but contended that they had no obligation to do so because of the unique nature of their positions at work. The district court rejected this argument. The court further held that "while the alleged list of retaliatory incidents offered by Plaintiffs are probative of Plaintiffs' retaliation claims, they do not indicate action taken because of Plaintiffs' sex" and "Plaintiffs offer no evidence that any of the actions taken against Plaintiffs within 300 days prior to their March/April 2005 EEOC complaints were discriminatory."

The district court also granted STDPP's motion for summary judgment for Edmond's and Barner's retaliation claims. For Edmond, the court held that she had not produced evidence that suggested the decision-makers who supposedly took the adverse action against her knew about her

protected activity. However, the district court determined that Bayraq had established a prima facie claim of retaliation and permitted her claim to proceed to trial.

Because Bayraq and Edmond raise different factual and legal issues, each appeal warrants separate consideration.

## II. Bayraq

### A. Factual and Procedural History

On November 18-19 and December 8-10, 2008, the district court held a non-jury trial to consider Bayraq's retaliation claim. On December 23, 2008, the district court entered its memorandum opinion and judgment in favor of STDPP.

It made the following findings of fact, which are the focus of Bayraq's appeal:

Bayraq has been an employee of the State of Tennessee for approximately twenty-five years. She spent the first fifteen of those twenty-five years with the Tennessee Department of Corrections ("TDOC"). Bayraq began her career as a Correctional Counselor 2 and was then promoted to the position of Probation and Parole Officer 3 ("PPO3"). In 1999, TDOC merged with the Board of Pardons and Parole to form the Board of Probation and Parole ("BOPP"). After the merger, Bayraq became an employee of BOPP, with whom she is currently employed as a PPO3.

In 1999, at the time of the merger, Bayraq was supervised by B.J. Murray. In 2000, Clarence Williams took charge of supervising Bayraq. As part of this supervision, immediate supervisors conduct an evaluation process of each of their employees, which consists of an initial meeting called a Job Performance Planning Discussion, at least one Interim Review Discussion, and a final Annual Evaluation. The initial Job Performance Planning Discussion is an opportunity for the supervisor and the employee to discuss the employee's specific responsibilities, as well as the supervisor's expectations. Thereafter, at the Interim Review Discussion and at the Annual Evaluation, the supervisor reviews the employee's job performance based on the goals, objectives, and expectations explained at the Job Performance Planning Discussion. After each of these discussions, the employee and supervisor are asked to sign and date the evaluation so as to indicate only that the particular discussion occurred. Towards the end of the calendar year, at the Annual Evaluation Discussion, the supervisor rates the employee's overall performance on a scale of one (1) to five (5), one being "Not Acceptable" and five "Exceptional."

3

For each of the years that Clarence Williams ("Williams") supervised Bayraq—2000, 2001, and 2002—she received a score of five (5) on her overall evaluation and recommendation. As a PPO3 under Williams, Bayraq testified that she supervised three to four PPO1 and PPO2 employees, but did not carry a caseload. In 2002, Bayraq had a number of problems with Williams. Bayraq claimed that Williams followed her around the office building and made sexually explicit gestures to her on at least one occasion.

In 2003, Williams was replaced as Bayraq's supervisor by Michelle Steward ("Steward"). As a result of this switch and realignment of staff, Bayraq did not receive an Annual Evaluation for 2003. Bayraq's responsibilities as a PPO3 continued unchanged, except that the responsibility of carrying absconder cases was added to her duties.

Bayraq testified that initially her relationship with Steward was acceptable but that it grew problematic. On April 1, 2004, Steward conducted an Interim Evaluation Discussion with Bayraq. In that discussion, Steward rated Bayraq with an overall score of four (4), meaning that her performance was "Superior." The following day, April 2, 2004, Bayraq called the governor's office to complain about the quality of the supervision and management in the Delta Region. Steward claims that after both of these events, the files of Cindy Harwell, Bayraq's subordinate, came to the attention of Steward. Harwell had recently left her position with BOPP, and before her files could be transferred to other officers, they had to be reviewed by Steward. Steward claimed that the files were in disarray—some files were not properly closed out, arrest checks were not been [sic] performed, and absconder files were located in other offices.

After reviewing Harwell's files, Steward gave Bayraq an oral warning. Steward held Bayraq accountable for the state of the files because Bayraq was Harwell's direct supervisor and thus ultimately responsible for them. Steward then issued a written follow-up to this oral warning in which she laid out specific examples of problem areas and ways to correct these issues. In response to this warning, Bayraq filed a grievance against Steward and against Helen Ford, the District Director. In that grievance, Bayraq claimed that the oral warning she received from Steward was in retaliation for her contacting the governor's office. She also stated that Ford and Charles Traughber, Chairman of BOPP, harassed and retaliated against her for "an [unspecified] incident that happened to me" in 1995. In response to Bayraq's April 8, 2004 grievance, she received a letter from Donna Blackburn, Executive Director, that stated there was sufficient documentary evidence to support the oral warning and that her grievance did not set forth a grievable matter as defined by department regulations.

After the First Interim Review Discussion on April 1, 2004 and the subsequent oral warning, Steward did not conduct a Second Interim Review of Bayraq. On November 30, 2004, Steward conducted the 2004 Annual Evaluation. In this evaluation, Steward gave Bayraq an overall score of three (3) or "Good." Bayraq refused to sign the evaluation but wrote in the section for employee's

4

comments that the evaluation was "unfair," that her work was being sabotaged, and that she was being harassed, intimidated, subjected to "fear tactics," and retaliated against because she had filed a grievance. Within the evaluation, Steward made a number of recommendations on how Bayraq could improve her performance, which included conducting arrest checks, submitting compliance exception reports after reviewing them with her staff, and making notes on files, after reviewing them, within sixty days so that her staff would be aware of required actions. Bayraq then filed a grievance in response to the Annual Evaluation alleging that Steward and Ford conspired to harass, intimidate, and retaliate against her. This grievance was found to be non-grievable.

On April 6, 2005, Bayraq filed a charge of discrimination with the EEOC alleging that she had suffered sexual harassment from Clarence Williams. The complaint also alleged that Ford and Traughber harassed and retaliated against her on the basis of her age. In early August 2005, Steward brought eighty-six files to Bayraq's attention. These eighty-six files had not been closed properly and in accordance with the fee manual policy, which resulted in the files showing that fees continued to accrue when the fees should have been terminated and deemed uncollectible. Steward told Bayraq to review these files and properly terminate the fee screens. In response to this request, Bayraq filed a grievance on August 5, 2005 in which she complained that Steward was making unrealistic demands and that her actions were in retaliation for Bayraq's EEOC "suit." On August 9, 2005, Bayraq filed another grievance complaining that Steward had "demanded" the return of forty-one of the eighty-six cases with a form from the electronic management system, TOMIS, attached to the front. Bayraq claimed that Steward's request was not necessary according to BOPP policy and procedure and that this was harassment in retaliation for seeking redress through the EEOC. Both of these grievances were determined to be non-grievable and Bayraq was informed of this through a letter from Chairman Traughber.

On August 22, 2005, Steward issued a written warning because Bayraq had not performed the work instructed regarding the eighty-six files. In her warning, Steward put-forth a detailed schedule for Bayraq to follow in order to terminate the review of the eighty-six files by September 13, 2005. After Bayraq received her written warning, she responded on September 20, 2005 with a letter rebutting and appealing the warning, which was sent to Chairman Traughber, State Director Gary Tullock ("Tullock"), and Governor Phil Bredesen. This letter once again made reference to harassment and retaliation as a result of her EEOC suit. Bayraq also complained that the files she was told to close were not hers and that she had never been asked in the past to do the things that Steward now requested. Chairman Traughber subsequently responded to this letter on October 26, 2005 and upheld the written warning.

In late November 2005, Steward conducted the Annual Evaluation Discussion with Bayraq. In that evaluation, Steward rated Bayraq's performance a 2 or "Marginal" due mainly to her failure to submit requested case files and her inability

to follow instructions related to the eighty-six case files. Steward noted that Bayraq's performance had not improved despite the fact that Ford and Steward had reduced the number of individuals that she supervised in order to improve her performance. Steward recommended that Bayraq's supervisory responsibilities be removed. Bayraq refused to sign the Annual Evaluation.

On December 13, 2005, Bayraq filed another grievance claiming that the 2005 Annual Evaluation was harassment in retaliation for her EEOC complaint. Two days later, Chairman Traughber wrote her a letter stating the evaluation was non-grievable.

Approximately ten months later, on October 10, 2006, Bayraq filed a grievance claiming that Steward and Ford were "deliberately delaying" her work and retaliating against her by making her submit typed copies of her annual reviews of the employees she supervised. On November 9, 2006, Chairman Traughber once again sent a letter stating that her grievance was non-grievable.

Also on November 9, 2006, Steward issued Bayraq's 2006 Annual Evaluation. Bayraq refused to attend the discussion. Bayraq was once again rated a 2 or "Marginal" for her work performance. Steward listed a number of areas in which Bayraq had made errors, including the supervision of her employees, and stated that Bayraq's performance had suffered as a result of her refusal to follow instructions. On December 6, 2006, Helen Ford informed Bayraq that her supervisory duties were being removed. Ford told her that it was not a demotion, that her salary would not be affected, but that her duties would be shifted so that she would work on cases and not have to supervise other employees. Ford stated that she made this change in an effort to give Bayraq an opportunity to improve her performance. On the same day that Ford told Bayraq that her supervisory duties would be removed, Bayraq filed a grievance alleging that Ford's decision was harassment and retaliation for Bayraq's EEOC complaint. Bayraq was informed a week later by letter that her grievance was non-grievable.

As part of the changes made by Ford, Bayraq was assigned to a new supervisor, Ms. Mary E. Williams. In 2007, as a PPO3 without supervisory responsibilities and working under Ms. Williams, Bayraq achieved a score of 4 or "Superior" on her Annual Evaluation. Although Williams became her new direct supervisor, Bayraq continues to work under Ford in the Delta District.

On May 17, 2006, after receiving her right to sue letter from the EEOC, Bayraq filed the instant law suit against Defendant State of Tennessee Department of Probation and Parole.

*Edmonds v. Tenn. Dep't of Prob. & Parole*, No. 06-CV-2295, 2008 WL 5378078, at *1-4

(W.D. Tenn. Dec. 23, 2008).

The district court next determined that Bayraq had engaged in protected activity, STDPP

knew about this protected activity, and Bayraq's loss of supervisory duties qualified as an adverse action against her pursuant to the Supreme Court's standard found in *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Nevertheless, the court held that Bayraq had failed to establish a prima facie case for her retaliation claim because she had failed to present evidence that suggested that there was a causal connection between her protected activity and the adverse employment action taken against her.

The court also determined that, even assuming a causal connection had been established for the purposes of the prima facie case, Bayraq had failed to prove, by a preponderance of the evidence, that the proffered reason for her removal was a pretext. The court found credible the testimony of STDPP's witnesses and the "detailed Annual Evaluations and memoranda presented at trial." Conversely, the court noted that "Bayraq presented no convincing evidence to controvert Defendant's assertion that her performance was poor and that it began to deteriorate in April 2004, twenty months before she engaged in protected activity." She responded to these allegations by testifying that she had continued to do her job the same way that she had performed it for the last twenty-two years and that she did not know why her supervisors asked her to do assignments she had never done before. The district court found "Bayraq to be obstinate, contradictory, and likely difficult to supervise, yet credible. Bayraq seemed incapable of providing a straight-forward answer even to questions asked by her own attorney."

On January 7, 2009, Bayraq filed a motion requesting that the court make additional findings of fact pursuant to Rule 52 and amend the judgment of the court pursuant to Rule 59. On January 13, 2009, the district court denied the motion and held that the findings of fact in the memorandum and opinion were sufficient to support the judgment. Bayraq appeals. She argues that: 1) the district

7

court erred when it refused to analyze her additional findings of fact; 2) she satisfied the fourth element of a prima facie case of retaliation; and 3) she proved retaliation at trial.

## B. Appeal of Factual Findings

Bayraq argues that the district court erred in its factual findings and when it refused to consider her motion pursuant to Rule 52 and Rule 59. She contends that the district court should have made additional findings of fact that would have supported her retaliation claim: namely, findings that key witnesses lied about their knowledge of her EEOC case and about their motives for taking certain actions against her.

A district court's findings of fact in a Title VII case are reviewed for clear error. *Zamlen v. City of Cleveland*, 906 F.2d 209, 217 (6th Cir. 1990) (quoting *Wrenn v. Gould*, 808 F.2d 493, 499 (6th Cir. 1987)). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City,* 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)) (internal quotations omitted). "When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 543 (6th Cir. 1989) (quoting *Anderson*, 470 U.S. at 575). "These credibility judgments are particularly the province of the district court, with only a narrow scope for appellate intervention when a district court has relied on testimony that simply cannot be believed." *New Conn. Bank & Trust v. Mussa (In re Cleveland Tankers, Inc.)*, 67 F.3d 1200, 1205 (6th Cir. 1995). Furthermore:

[t]his Court has enunciated a liberal standard for reviewing the adequacy of a District Court's findings. Findings should be comprehensive and relevant to the issues so as to provide a rational basis for the trial court's decision. It is not necessary for the District Court Judge to prepare elaborate findings on every possible issue raised at trial. However, there must be findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on which an ultimate conclusion can rationally be predicated. The findings should be explicit so as to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the grounds on which the trial court reached its decision.

*Grover Hill Grain Co. v. Baughman-Oster, Inc.*, 728 F.2d 784, 792-93 (6th Cir. 1984) (internal citations omitted).

Bayraq contends that the documentary proof and testimony of Steward, Ford, and Traughber were "so internally inconsistent or implausible on their face that a reasonable fact finder would discredit the testimony." She also accuses each witness of perjury. Bayraq falls well short of satisfying her burden on appeal. Steward testified consistently at trial that, although she knew about Bayraq's grievances, she did not know that any of them pertained to sexual harassment until after she had given Bayraq a score of two on her performance review. She admitted seeing documents that said EEOC, but testified that she did not know what EEOC meant at the time, and did not inquire further into the matter. Ford testified that she did not know about the EEOC charge, or any allegations of sexual harassment, until after Bayraq filed suit, thus it could not have been her reason for taking away Bayraq's supervisory duties in December 2006. Traughber testified that he received reports, sometimes oral, after his staff investigated a grievance that alleged retaliation or harassment. He reviewed each report and determined if the accusation was grievable. Bayraq presented no documentary evidence or testimony that would compel a reasonable fact finder to not believe STDPP's witnesses. In sum, the testimony presented by each witness was plausible, and it would not be appropriate for this court to reassess credibility on appeal.

9

## C. Prima Facie Case

Bayraq appeals the district court's determination that she failed to establish a prima facie case. To establish a prima facie case of retaliation, a plaintiff must show:

> (1) that plaintiff engaged in an activity protected by Title VII;  (2) that the exercise of his civil rights was known by the defendant;  (3) that, thereafter, the defendant took an employment action adverse to the plaintiff;  and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Wrenn v. Gould*, 808 F.2d 493, 500 (6th Cir. 1987). The district court determined that Bayraq did not meet the fourth element. "[T]o establish the element of causal link a plaintiff is required to 'proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action.'" *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997). Generally, temporal proximity alone is not enough to establish a causal link. *See Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim."). *But see Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523-25 (6th Cir. 2008) (surveying Sixth Circuit cases that suggest that temporal proximity alone can establish a causal connection).

However, the district court's determination is moot on appeal because the district court conducted a trial:

> [A] *prima facie* case is defined as "sufficient evidence in the type of case to get plaintiff past a motion for directed verdict in a jury case or motion to dismiss in a nonjury case;  it is the evidence necessary to require defendant to proceed with his case." *Black's Law Dictionary* 1190 (6th ed. 1990). The finding that plaintiff has proven a *prima facie* case forces the defendant to proceed with its case. It necessarily follows, then, that the defendant is not entitled to judgment as a matter of law or summary judgment if a plaintiff has proven its *prima facie* case. Following a trial on the merits, the district court, therefore, cannot return to a consideration of whether plaintiff has proven its *prima facie* case. This is a preliminary matter which cannot be revisited at a later time.

10

*Avery Dennison*, 104 F.3d at 861**;** *see also Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 545 (6th Cir. 2008) ("Both the Supreme Court and this court, however, have held that a party framing its argument on appeal in prima facie terms, after a jury trial on the merits, has 'unnecessarily evaded the ultimate question of discrimination *vel non*.'" (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 (1983))). Therefore, the analysis proceeds to the ultimate question of whether STDPP retaliated against Bayraq because of her protected activity and the issue of causal connection is part of that consideration. *See Kovacevich v. Kent State Univ.*, 224 F.3d 806, 825 (6th Cir. 2000) ("Of course, there is nothing to prevent the court from considering evidence that also bears on that prima facie case as long as it does so in order to address the ultimate question of discrimination."); *see also Imwalle*, 515 F.3d at 546 ("This is not to say, however, that a plaintiff's failure to present evidence sufficient to make out a prima facie case is irrelevant to our review of the ultimate question.").

### D. Retaliation Determination

At trial, Bayraq had the burden of proving, by a preponderance of evidence, that STDPP's proffered reason was a pretext to hide unlawful discrimination. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). She had to show that "1) the stated reasons had no basis in fact; 2) the stated reasons were not the actual reasons; or 3) that the stated reasons were insufficient to explain the defendant's action." *Id.* Furthermore, she had to demonstrate that not only were the given reasons pretexts, but the discrimination was the real reason for the adverse action. *Id. St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

Bayraq's argument is two-fold: 1) she argues that Steward, Ford, and Traughber offered

11

inaccurate testimony, and that their alleged legitimate reasons for the written reprimands, poor evaluations, and the removal of her supervisory duties cannot be legitimately believed, and 2) she argues that her prior evaluations and the testimony of Edmond, Barner, and Mary Logan-Jones, another STDPP employee, demonstrate a corrupt pattern and practice of retaliation by STDPP.

Her first argument fails because, as already discussed, the district court did not err in its credibility or factual findings. Despite her contentions otherwise, the district court did not commit error just because it did not believe her supporting testimony. *See In re Cleveland Tankers, Inc.*, 67 F.3d at 1205 ("Here, the testimony of different witnesses directly contradicted each other, and the district court made a necessary choice between two versions."). Second, Bayraq's allegations of a corrupt pattern of retaliation are of no moment because, if such a pattern exists, she was not a victim of the retaliation.

We now proceed to Edmond's appeal of the district court's dismissal of her case at the summary judgment stage.

### III. Edmond

### A. Factual and Procedural History

Edmond began her employment with Tennessee in 1998 as a probation officer within the Tennessee Department of Corrections. After the merger, she became an employee at STDPP, and Williams directly supervised her. She alleges that he sexually harassed her and that Williams, Traughber, and Ford retaliated against her because of her grievances and complaints about Williams's conduct. Specifically, she alleges that he (1) said to her in a sexually explicit way, "I have heard about you," (2) invaded her personal space, (3) followed her to lunch and to her home, (4) repeatedly called her into his office for trivial reasons, and (5) once opened up his legs and

moved his hips in an up and down motion.

Edmond filed her first grievance with STDPP on November 20, 2001. This grievance and the ones that followed never alleged sexual harassment and all were found to be non-grievable by Traughber. Nevertheless, Edmond maintains that she repeatedly complained to STDPP about sexual harassment. She says she made a phone call to the Employee Assistance Program hotline in August 2001 to complain about sexual harassment, had a conversation with a co-worker about Williams's sexual harassment, and, in November 2001, wrote Ford to inform her that Williams had called her into his office for "callous and infantile" reasons.

### B. Standard of Review

Edmond appeals the district court's grant of summary judgment in favor of STDPP. This court reviews a grant of summary judgment de novo. *Baggs v. Eagle-Picher Indus.,* 957 F.2d 268, 271 (6th Cir. 1992) (citing *EEOC v. Univ. of Detroit*, 904 F.2d 331, 334 (6th Cir. 1990)). For a grant of summary judgment to be upheld, it must be determined, upon review of the pleadings, affidavits, and other submissions, that "'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(c)). "When evaluating this appeal, this court must view the evidence in the light most favorable to the non-moving party." *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 101-02 (6th Cir. 1995) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

### C. Retaliation

For her retaliation claim, Edmond appeals the district court's determination that she did not establish that STDPP knew about her protected activity. The district court held that none of the evidence suggested that Edmond was discriminated against because of her gender and that none of

the decision-makers knew of any protected activity. Of all the incidents mentioned by Edmond, the court concluded that only two of them could potentially constitute protected activity: (1) the phone call to the company complaint hotline and (2) her conversation with a co-worker. However, the court noted that, with respect to both of these incidents, there was no evidence that suggested management knew about the complaints.

On appeal, Edmond neither contests that she must establish that a decision-maker knew about her protected activity nor claims that she satisfied her burden of proof with the incidents discussed in the opinion. *See Felts v. Campbell*, 134 F.3d 371 (table), 1998 WL 13403, at *4 (6th Cir. Jan. 7, 1998) ("However, Plaintiff's biggest obstacle with this claim is showing that anyone at TDHS, no less a decision-maker, had knowledge of her 1988 EEOC charge, as required for the second element of the *Canitia* standard."). She has instead limited her appeal to arguing that another piece of evidence, that was in the record but not mentioned in the opinion, established that management knew she had engaged in protected activity.

On November 2, 2002, Edmond wrote a letter to Traughber, where she made allegations of inappropriate conduct by Williams and management practices that were "illegal, arbitrary and capricious." Several other STDPP employees also signed this letter. In response, STDPP instigated an investigation and made a report detailing the findings of that investigation that was submitted to Traughber's office. Edmond argues that this report satisfies her burden with regard to management's knowledge.

Review of the investigative report, however, reveals that there is nothing in the report that would reasonably alert management to any sexual harassment concerns. Edmond's letter, which was included in full in the report, did not make any allegations of sexual harassment. Likewise, the

14

findings of the investigation, which are based on the responses of employees to interview questions, do not mention any concerns that touch on sex or sexual harassment. Finally, although the report concluded that a hostile work environment existed at STDPP, it did not mention sex or sexual harassment.

Perhaps in acknowledgment of this deficiency, Edmond provides a list of questions included in the report, both were supposedly asked to different employees during the investigation, to demonstrate management's knowledge of the sexual harassment allegations. Specifically, Edmond relies upon the following questions, out of a list of over fifty questions, to establish STDPP's knowledge:

1. Have you ever been stalked or followed by Mr. Williams?
2. Define stalking. Explain the particular behavior that Mr. Williams exhibited that you consider to be stalking. Please be specific.
3. Has Mr. Williams ever followed you at night? Were you working at that time?
4. Has Mr. Williams ever followed you during the day? Were you working at that time?
5. Has Mr. Williams ever called you at home? Has Mr. Williams ever come to your home?
6. Does Mr. Williams have you call him when you leave work?
7. Has Mr. Williams ever invaded your sense of personal space? If so . . . how and please explain.

However, these questions, especially when viewed with the full list of questions included in the report, suggest that management knew about allegations of Williams's allegedly aggressive management style, not claims of sexual harassment. Moreover, even if we assume that these questions were asked to ferret out whether Williams engaged in sexual harassment, Edmond has offered no evidence that suggests that any of the employees interviewed responded to these questions with allegations of sexual harassment. Accordingly, a reasonable juror could not find that management knew about any sexual harassment claims based on these questions alone.

15

### D. Disparate Treatment

Edmond purports to appeal the dismissal of her sexual harassment claim, but she does not address any of the dispositive issues on appeal. She maintains that the court dismissed her harassment claim solely because she did not produce any evidence that established that STDPP knew her complaints involved sexual harassment. Contrary to this categorization, the district court dismissed Edmond's sexual harassment complaint because she, and her co-plaintiffs, did not put forth any evidence of similarly situated male employees, and because none of the harassment allegations made by Edmond pertained to sex. Since these aspects of the district court's ruling are not challenged on appeal, the dismissal of her sexual harassment claim stands.

### IV. Conclusion

For the foregoing reasons, we **AFFIRM**.